## McDONOUGH v GENERAL MOTORS CORPORATION

### Decision of the Court

1. DEATH—WRONGFUL DEATH—TRIAL—DIRECTED VERDICT.

    Directed verdict for defendant in an action against a corporation for wrongful death of a journeyman iron worker, employed by a contractor which was erecting the structural steel framework for an additional floor at the corporation's plant, is reversed and case remanded for a new trial.

### Per Curiam Opinion

### Black and Swainson, JJ.

2. MASTER AND SERVANT—NEGLIGENCE—DANGEROUS ACTIVITY—DELE-GATED DUTY.

    *The inherently or intrinsically dangerous activity doctrine is founded upon a theory which is closely akin to, but not exactly the same as, strict liability and it is applied where a duty is imposed upon the employer in doing work necessarily involving danger to others, unless great care is used, to make such*

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 22 Am Jur 2d, Death § 254.

[2, 9] 53 Am Jur 2d, Master and Servant §§ 143, 420, 421.

[3] 41 Am Jur 2d, Independent Contractors § 41.

[4] 41 Am Jur 2d, Independent Contractors §§ 33, 41, 53.

[5, 6] 41 Am Jur 2d, Independent Contractors § 41.

[7, 16] 41 Am Jur 2d, Independent Contractors § 53.

[8] 41 Am Jur 2d, Independent Contractors § 6.

[10, 17, 18] 41 Am Jur 2d, Independent Contractors §§ 41, 42.

   Non-delegable duty of employer with respect to work which is inherently or intrinsically dangerous, 23 ALR 1084.

[11] 58 Am Jur, Workmen's Compensation §§ 60, 137.

[12] 41 Am Jur 2d, Independent Contractors § 48.

[13] 41 Am Jur 2d, Independent Contractors §§ 30, 31.

   Liability of the contractee for injuries sustained by the contractor's servants in the course of the stipulated work, 44 ALR 932.

[14] 53 Am Jur 2d, Master and Servant § 267.

[15] 41 Am Jur 2d, Independent Contractors § 35.

   53 Am Jur 2d, Master and Servant § 291.

*provision against negligence as may be commensurate with the obvious danger; it is this duty which cannot be delegated to another so as to avoid liability for its neglect.*

3. Master and Servant—Negligence—Unusual Perils.

If one employs a contractor to do a job of work for him which, in the progress of its execution, obviously exposes others to unusual perils, he ought to be responsible for he causes acts to be done which naturally expose others to injury.

4. Master and Servant—Negligence—Contracts—Dangerous Work—Directed Verdict—Jury Question—Burden of Proof.

*Plaintiff made out, as against defendant's motion for a directed verdict, a case which tended to show that a contract between defendant and a contractor for erection of structural steel framework for an additional floor above defendant's manufacturing plant involved danger to others unless great care was used and that defendant failed to see that such "great care" attended execution of the contract; the issue of actionable negligence as charged in a count of plaintiff's complaint was for the jury where there was proof or inference from proof, not only that the contracted work was inherently dangerous, but also proof or inference from proof that "great care" was not used and plaintiff's decedent, an employee of the contractor, was killed in performing the steel work although plaintiff bore a burden of legal persuasion much heavier than obtains in the typical case where ordinary negligence is charged.*

5. Evidence—Judicial Notice—Overhead Riggers—Assemblers of Steel Beams—Contracts—Dangerous Work.

*Judicial notice may be taken that the assigned task of overhead riggers and assemblers of heavy steel beams and shapes is usually fraught with out-of-ordinary danger to such employees as well as others; taking such notice it is* prima facie *apparent (but no more than that) that the job called for by a contract, which was the erection of structural steel framework for an additional floor to be built above a then existing manufacturing plant, had to be performed with "great care" lest employees—not only of the contractor but of the factory workmen below—be or become endangered by such performance.*

6. Master and Servant—Dangerous Work—Contracts—Delegated Duty—Negligence.

*Under the rule of inherent or dangerous activity doctrine of liability of one employing a contractor to do a job for him, exemptive provisions in a contract between the owner of prop-*

erty and a contractor that the contractor is responsible for his work and for the protection of persons on the property, is precluded because the owner cannot escape his duty by turning the whole performance over to a contractor nor can he delegate that duty so as to avoid liability for its neglect and a person killed in the performance of the contract was not a party to the contract and neither he nor his personal representative became bound thereby.

7. MASTER AND SERVANT—CONTRACTS—INDEPENDENT CONTRACTORS—CONTROL—JURY QUESTION—DEATH.

A jury question was created in a wrongful death action by the personal representative of a deceased employee of a contractor against a property owner, which drafted all of the contract documents between it and the contractor, where the owner did, upon view favorable to plaintiff, reserve a measure of firm control over the job to be done for it by the contractor and it then, again on favorable view, attempted to water the same by a provision in the "Architect-Engineer Status" provision of the contract although it cannot be said, as a matter of law, that the owner retained such "control" but there was a mixed question of fact and law, determinable by due interpretation and application of factual testimony, expert testimony and contract documents which are likely to be susceptible of variant conclusions.

8. CONTRACTS—CONSTRUCTION WORK—CONTROL—MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—THIRD PARTIES.

An owner contracting to have construction done on his property cannot reserve to himself the administration, inspection, assistance and other actions which do or may authorize some measure of influence or dominion over the way the work is to be done and yet maintain as a matter of law that such reservation shall not be construed as undertaking supervisory control of the work or the means and methods employed by the contractor; when a statutory action is brought against a third party under a section of the Workmen's Compensation Act by one not a party to such an Owner-Contractor agreement and it is shown either in fact or law that the relationship of employer and employee did not exist between the owner and the plaintiff or personal representative bringing suit, the applied construction of that agreement is for the court to determine according to its processes, not the drafter of the contract (MCLA 413.15).

Opinion Concurring in Part and Dissenting in Part

T. M. Kavanagh, C. J., and Adams, J.

9. Master and Servant—Negligence—Dangerous Activity—Delegated Duty.

*The inherently or intrinsically dangerous activity doctrine is founded upon a theory which is closely akin to, but not exactly the same as, strict liability and it is applied where a duty is imposed upon the employer in doing work necessarily involving danger to others, unless ordinary care is used, to make such provision against negligence as may be commensurate with the obvious danger; it is this duty which cannot be delegated to another so as to avoid liability for its neglect.*

10. Master and Servant—Inherently Dangerous Activity—Independent Contractors.

*The doctrine of "inherently dangerous activity", as relevant to the type of action brought against a landowner by an injured employee of an independent contractor, has been recognized in Michigan jurisprudence for nearly 100 years.*

11. Workmen's Compensation—Common Law—Third-Party Action.

*The workmen's compensation law has never abrogated an injured employee's common-law right to bring an action against a third-party wrongdoer.*

12. Master and Servant—Contractors—Duties.

*A contractor, constructively in possession and control of the property, has a general duty to act so as not to unreasonably endanger the well-being of employees of either subcontractors or inspectors or anyone else lawfully on the site of the project.*

See headnote 3.

13. Master and Servant—Independent Contractors—Defects—Duties.

*The owner or occupier of premises is under no duty to an independent contractor and the latter's employees against risks arising from or intimately connected with defects of the premises, or of machinery or appliances thereon, which the contractor has undertaken to repair.*

14. Master and Servant—Independent Contractors—Dangers—Assumption of Risk.

*The owner of premises is not liable for death or injury of an independent contractor or one of his employees resulting from dangers which the contractor, as an expert, has known or as to which he and his employees assumed the risk.*

15. MASTER AND SERVANT—ASSUMPTION OF RISK—SAFE PLACE OF
   WORK—DANGERS—INDEPENDENT CONTRACTORS—JURY QUESTION.

   *Where a risk separate and distinct from those created by defects
   to be repaired under a contract result in the injury or death of
   the contractor or an employee of the latter, the contractee, who
   is the owner or occupier of premises, cannot successfully invoke
   the defense of assumption of risk and the general rules govern-
   ing the extent of his duty to furnish an independent contractor
   and his employees a safe place to work and to warn them of
   hidden dangers are applicable; the determination of whether
   the risk was in fact separate and distinct from those created by
   the defects to be repaired must be resolved by the jury.*

16. MASTER AND SERVANT—INHERENTLY DANGEROUS ACTIVITY—EVI-
   DENCE—JURY QUESTION.

   *Sufficient proofs and reasonable inferences therefrom were pre-
   sented and give rise to a jury submissible question of whether
   the work to be performed by a contractor is an inherently
   dangerous activity, and whether that degree of care was used
   which an ordinarily prudent person would use under the same
   or similar circumstances where the contractor had contracted
   with the defendant, owner of the premises, to erect the struc-
   tural steel framework for an additional floor above defendant's
   plant and the contractor's employee was killed when a boom of
   a derrick fell either to careless operation of the derrick or
   faulty installation of the boom cable.*

CONCURRING OPINION

WILLIAMS, J.

See headnote 6.

DISSENTING OPINION

T. E. BRENNAN and T. G. KAVANAGH, JJ.

17. MASTER AND SERVANT—NEGLIGENCE—INDEPENDENT CONTRACTORS
   —INHERENTLY DANGEROUS ACTIVITY.

   *The general rule of law is that an owner of premises is not liable
   to persons injured through the negligence of an independent
   contractor; but, where the contract calls for the performance on
   an inherently dangerous activity, a nondelegable duty reposes
   with the owner, and he may not insulate himself from the
   performance of that duty by the employment of a contractor.*

18. MASTER AND SERVANT—INDEPENDENT CONTRACTORS—INHERENTLY
DANGEROUS ACTIVITY—THIRD PARTIES—CONTRACTS—PRIVITY.

> The "inherently dangerous activity" doctrine rule that if one
> employs a contractor to do a job of work for him which, in the
> progress of its execution, obviously exposes others to unusual
> perils, he ought to be responsible for he causes acts to be done
> which naturally expose others to injury is designed to protect
> innocent third parties injured by the execution of an inherently
> dangerous undertaking; the rule is not designed, nor was it
> intended, to benefit the contractor who undertakes the danger-
> ous work, or his employees because neither the contractor nor
> his employees are "others", as contemplated in the rule, indeed
> they are privy to the contract which creates the peril.

Appeal from Court of Appeals, Division 2, J. H. Gillis, P. J., and Danhof and Mahinske, JJ., affirming Genesee, Philip C. Elliott, J. Submitted March 9, 1972. (No. 12 March Term 1972, Docket No. 53,258.) Decided October 31, 1972. Rehearing denied December 28, 1972. Motion for reconsideration filed January 17, 1973.

28 Mich App 7 reversed.

Complaint by Joan Marie McDonough, administratrix of the estate of Michael McDonough, against General Motors Corporation, Christman Company, United Crane & Shovel Corporation, and American Hoist & Derrick Company for damages for wrongful death. Christman Company, United Crane & Shovel Corporation, and American Hoist & Derrick Company dismissed with prejudice. Directed verdict for defendant General Motors Corporation. Plaintiff appealed to the Court of Appeals. Affirmed. Plaintiff appeals. Reversed and remanded for new trial.

*Harry M. Philo* and *Marcus, McCroskey, Libner, Reamon & Williams* (by *Robert J. Van Leuven*), for plaintiff.

*Plunkett, Cooney, Rutt & Peacock* (by *Charles T. McGorisk, Jeannette A. Paskin,* and *Leonard E.*

*Nagi) (Ross L. Malone, Otis M. Smith,* and *James P. Melican, Jr.,* of counsel), for defendant General Motors Corporation.

PER CURIAM. Plaintiff sued defendant General Motors Corporation and others for wrongful death of her decedent. All defendants, General Motors excepted, were dismissed with prejudice. Trial against General Motors ended with rendition of an instructed negative verdict and entry of a negative judgment. Division 2 affirmed (28 Mich App 7). Other than as amplified in the ensuing opinion, counsel for General Motors have supplied a generally satisfactory statement of facts:

"Michael McDonough, a journeyman iron worker employed by Paragon Bridge & Steel Company, was killed on October 3, 1963 in a construction accident at the Chevrolet assembly plant in Flint. His employer had contracted to erect the structural steel framework for an additional floor which was to be built above the then-existing plant. Sometime before the day of the accident, Paragon had installed several steel trusses which were to become part of the structure. At the time of the accident, Mr. McDonough was standing on one of these trusses. The Paragon crew of which he was a member had just completed the erection and rigging of a stiff-legged derrick, owned by Paragon, which was to be used to lift steel beams onto the roof of the plant. It was then late in the afternoon and it appeared that the derrick would not be used until the following morning. Following the customary practice in the industry, the crew proceeded to tie the boom of the derrick to a permanent truss in order to secure it for the night. While Mr. McDonough was bending under the boom attempting to secure it to the truss the boom fell, due either to careless operation of the derrick or faulty installation of the boom cable. It struck him and caused serious injuries which resulted in his death."

Division 2 did not meet squarely plaintiff's ap-

peal to the exception which, by our decisions, has been engrafted into the general rule of nonliability of an owner-contractee, when the work contracted for by him is "inherently dangerous".[1] For an up to date statement of the exception, see *Vannoy v City of Warren,* 15 Mich App 158, 163–164 (1968):

"In Michigan the inherently or intrinsically danger-ous activity doctrine is founded upon a theory which is closely akin to, but not exactly the same as, strict liability. The principle is applied 'where a duty is imposed upon the employer in doing work necessarily involving danger to others, unless great care is used, to make such provision against negligence as may be commensurate with the obvious danger. It is this duty which cannot be delegated to another so as to avoid liability for its neglect.' *Inglis v Millersburg Driving Association* (1912), 169 Mich 311, 321, 322."

The *Inglis* decision seems to mark the first occa-sion when this Court applied the exception to facts tending to show that the work contracted for was inherently dangerous or perilous. In that case the Court approved expressly an extended passage taken from *Covington, etc, Bridge Co v Steinbrock & Patrick,* 61 Ohio St 215; 55 NE 618; 76 Am St Rep 375 (1899), and then went on to conclude *(Inglis* at 321–322):

"The principle involved cannot be better stated than it is in the sentence last quoted, *supra.* It is not applied to those cases where the injuries occur which are collateral to the employment, like the dropping of material by the servant of a contractor upon a person

---

[1] The panel stated what to it was the dispositive issue (28 Mich App 9):

" * * * whether a property owner, who contracts to have construc-tion work performed on his property and who does not retain control over the methods and procedures of a subcontractor, has an affirma-tive legal duty to protect an employee of the subcontractor from injury caused by the negligent use by the subcontractor or improper condition of the subcontractor's equipment."

passing by, but where a duty is imposed upon the employer in doing work necessarily involving danger to others, unless great care is used, to make such provision against negligence as may be commensurate with the obvious danger. It is this duty which cannot be delegated to another so as to avoid liability for its neglect."

Subsequent cases following *Inglis* and applying its rule are *Huntley v Motor Wheel Corp,* 31 Mich App 385, 393 (1971); *Vannoy v City of Warren,* 15 Mich App 158, 163–164 (1968); *Utley v Taylor & Gaskin, Inc,* 305 Mich 561, 572 (1943); *Grinnell v Carbide Chemicals Corp,* 282 Mich 509, 527 (1937); *Watkins v Gabriel Steel Co,* 260 Mich 692, 695 (1932), and *Wight v H. G. Christman Co,* 244 Mich 208, 215 (1928). Probably the best statement of the mentioned exception to the general rule, succinct and specific as always when written by Mr. Justice COOLEY, was quoted in *Inglis* (from 2 Cooley on Torts, 3d ed, p 1091):

"If I employ a contractor to do a job of work for me which, in the progress of its execution, obviously exposes others to unusual perils, I ought, I think, to be responsible, * * * for I cause acts to be done which naturally expose others to injury." *(Inglis* at p 319.)

The foregoing Michigan rule is echoed now by 2 Restatement of Torts 2d, particularly sections 416 and 427 (pp 395 and 415 respectively):

"416. One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

"427. One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

The first question is whether plaintiff made out, as against defendant General Motors' motion below, a case which tended to show that this contract of construction involved "danger to others unless great care is used" and that defendant General Motors failed to see that such "great care" attended execution of the contract.[2] We think she did, and that the issue of actionable negligence as charged in the first count of her complaint was for the jury.

True, plaintiff bore a burden of legal persuasion that was, by the very nature of the stated rule and its exception, much heavier than obtains in the typical case where ordinary negligence is charged. There must be proof or inference from proof, not only of contracted work that is inherently dangerous, but also proof or inference from proof that "great care" was not used. We hold that such proof was supplied here.

Generally, and as already known by comparing the ever steepening rates of workmen's compensation insurance, judicial notice may be taken that the assigned task of overhead riggers and assemblers of heavy steel beams and shapes is usually fraught with out-of-ordinary danger to such employees as well as others. Taking such notice, it is

---

[2] "Great care", in cases as at bar, means some sort of a safety precaution program, initiated and maintained by the contracting owner. Whether that was done became upon the record a question for the jury.

prima facie apparent (but no more than that) that the job called for by this contract had to be performed with "great care" lest employees—not only of Paragon but of Chevrolet workmen below—be or become endangered by such performance.

Promptly taken photographs of the scene of this fatal accident were received in evidence. They provide striking proof of the inherently dangerous character of this contracted steel construction job. The crew was not framing a new building. It was framing a new floor and new roof over an existing floor and roof of a great manufacturing plant, with work proceeding below as before. The risk on favorable view was that much greater, for it extended to more workmen than those employed by the independent contractor. Had the boom of Paragon's derrick, which the crew had just lengthened from 50 feet to 60 feet, *not* fallen partly across the closest of the trussed girders which the crew had fastened into place, it is not unlikely that the boom or some heavy part thereof would have crashed through or partly through the original roof of the plant, beneath which Chevrolet workmen presumably were at work or, considering the time of day, were coming and going between shifts. When the wrong sized cable,[3] which through a succession of sheaves connected the drum of the derrick with the end of the boom, snapped and dropped the boom, the outer end of the latter caught on and was held by the girder; a fact we regard as fortunate for all nearby, plaintiff's decedent excepted.

---

[3] The cable used was five-eighths of an inch in diameter; whereas the derrick was designed for cable diametered three-eights to one-half of an inch. Importantly, the sheaves of the derrick were not enlarged to fit the cable in use and there was proof that the length of cable used was too short, the extension of the length of the boom considered.

We do *not* say that the mentioned exception
applies here *as a matter of law* or, for that matter,
that it applies *as a matter of law* to other like
cases. We say only that the evidence adduced
warranted submission of the question of liability
as charged, under the rule of *Inglis* and subse-
quent cases.

General Motors however claims immunity from
liability under two provisions of the construction
contract. They are:

"11. *Contractor's Responsibility:* The Contractor shall
be responsible for his work and every part thereof and
for all materials, tools, appliances and property of every
description used in connection therewith. The Contrac-
tor shall assume all risks of damage or injury to prop-
erty or persons used or employed on or in connection
with the work, and of all damage or injury to any
persons or property wherever located, resulting from
any action or operation under the Contract or in con-
nection with the work, and shall protect, defend and
save harmless the Owner from and against all claims
on account of any such damage or injury."

"30. *Protection of Premises and Persons:* The Con-
tractor shall take all necessary precautions, provide
barricades, guards, signs, notices, and such protection
as may be required by laws and regulations for the
protection of the Owner's and other Contractors' prop-
erty, as well as adjacent property, on both new and
existing work. By such provisions, the Contractor shall
also protect all persons who may be on the premises or
in adjacent areas affected by the Contractors' opera-
tions."

The exception we have considered precludes
matter-of-law employment of these allegedly ex-
emptive contractual provisions. As said regularly
in the cited authorities, the owner "cannot escape
this duty by turning the whole performance over
to a contractor"; nor can he delegate that duty "so

as to avoid liability for its neglect". The decedent was not a party to the contract and neither he nor his personal representative became bound thereby. Hence, the most that may be said for such provisions is that they may or may not, as between the contracting parties, have provided some right of indemnity or contribution should General Motors be held to respond in damages.

A separate question is raised and briefed. Since the case is to go back for retrial, we should and do consider it. Plaintiff states:

"Does an employer of a contractor doing major building construction who retains the right to control the safety performance, methods and program, enjoy immunity from suit for the negligent exercise of that control?"

General Motors counterstates:

"Does a property owner, who contracts to have construction work performed on his property and who does not retain control over the methods and procedures of a subcontractor, owe a duty of due care to protect an employee of the subcontractor from injury caused by the careless installation, use or the improper condition of the subcontractor's own equipment?"

The questions thus stated and counterstated are of course argumentative. We think the issue may be couched best by inquiring whether, by what is contractually designated as the "Architect-Engineer's Supervision", General Motors provided for such measure of control over the conduct of the work, by its architect-engineer, as might or did create the same jury question as the Court found in *Lake Superior Iron Co v Erickson,* 39 Mich 492 (1878); a decision we shall presently review.

Exhibit 53a sets forth General Motors' "Structural Steel" specifications. These specifications

were drafted for General Motors by its architectural firm, Albert Kahn Associated Architects and Engineers, Inc. The architect-engineer was General Motors' overall administrator of the construction job as contracted. His legal position was, the contract documents considered, poised delicately—and ambiguously—between that of a general superintendent of major construction, and that of a mere consultant having no right to interfere or duty other than of advice. Consider his "status" (Exhibit 53a):

*"Architect-Engineer Status:* The Contractor agrees the Architect-Engineer and his representative shall have access to the work at all times and that the Architect-Engineer shall have the right to act in any and all of the various capacities assigned to him under the Contract.

"The administration, inspection, assistance and other actions by the Architect-Engineer or the Architect-Engineer's Superintendent, as hereinbefore provided, shall not be construed as undertaking supervisory control of the construction work or of means and methods employed by the Contractor, and shall not relieve the Owner or the Contractor from any of their responsibilities or obligations under the Contract; nor shall the Owner or the Contractor request or require the Architect-Engineer or the Architect-Engineer's Superintendent to undertake such supervisory control or to administrate, supervise, inspect, assist or to act in any manner so as to relieve the Owner or the Contractor from such responsibilities or obligations."

Between the two extremes thus forensically submitted lies the correct answer, review here being that of grant of motion for direction of a negative verdict. General Motors did *not* as a matter of law, retain "control". Nor can it be said, as a matter of law, that General Motors retained such "control". We have here a mixed question of fact and law,

determinable as usual in these cases by due interpretation and application of factual testimony, expert testimony and—particularly here—contract documents which on account of the very length thereof are likely to be susceptible of variant conclusions.

Having pored over 470 pages of contract documents forming a part of the original record,[4] and having done so in conjunction with a mass of testimony adduced by plaintiff having to do with what in the record is known as General Motors' "Safety Program", one certain conclusion comes to the surface. It is that General Motors, drafter of all these contract documents, did upon view favorable to plaintiff reserve a measure of firm control over the job to be done for it by Paragon, and that it then (again on favorable view) attempted to water the legal stock of that conclusion by the quoted "Architect-Engineer Status" provision.

An owner contracting to have construction work done on his property cannot reserve to himself "[t]he administration, inspection, assistance and other actions" which do or may authorize some measure of influence or dominion over the way the work is to be done, and yet maintain as a matter of law that such reservation "shall not be construed" as undertaking supervisory control of the work "or the means and methods employed by the Contractor". When a statutory action (MCLA 413.15; MSA 17.189) is brought by one not a party to such an Owner-Contractor "Agreement", and it is shown either in fact or law that the relationship of employer and employee did not exist between the owner and the plaintiff or personal representative bringing suit, the applied construction of that

---

[4] Exhibits 53, 53a, 53b, 53c, 53d, 53n and 53o.

agreement is for the court to determine according to its processes; not the drafter of the contract.

For a decision that is closely analogous, both in law and fact, review *Lake Superior Iron Co v Erickson, supra.* There as here "[t]here was no employment relation" between the owner and the plaintiff's decedent. Justice CAMPBELL proceeded (pp 497–498):

"It is proper first to consider the respective positions of the parties. Day and McEncroe [officers of the mining company] stood in the place of the mining company in making these contracts. There was no employment relation between them and Erickson, who was laboring under the contractors. So far as this changed the relative liabilities of the parties it must operate in this case. But while there are cases in which there is no duty or legal privity between principals and the servants of those who contract with them, this lack of privity is not universal and absolute. If, for example, a railway company were to contract with a firm of car-builders to build cars according to given plans in places under the entire control of the builders, there could be no possible corporate responsibility for injuries received by workmen in their callings. But on the other hand it might be quite possible for men to be employed in piece-work in the shops of such companies where they retained more or less control, when for the failure of a corporate duty the workmen or strangers injured by that failure might have a cause of action for the wrong directly against the corporation, although it had not employed them." (Citing Michigan cases.)

*TO CONCLUDE:*

1. Since the issue may arise on retrial, note is made of plaintiff's alternative contention that the record supports her allegation that General Motors, contracting thus with Paragon, knew or should have known that it had engaged "an incompetent contractor". We find in the record no evidence or permissible inference from evidence tend-

ing to justify submission to the jury of that alternative theory of recovery.

2. To avoid possible interpretation that this opinion affects that type of case mentioned in *Inglis*, "where the injuries occur which are collateral to the employment, like the dropping of material by the servant of a contractor upon a person passing by", the profession is advised that the question of application of the exception to such a case, is expressly reserved.

Reversed and remanded for new trial. Costs of all three courts to plaintiff.

BLACK and SWAINSON, JJ., concurred.

.   .   .   .   .   .   .   .

SUPPLEMENT, by Justice BLACK (October 31, 1972):

This appeal was duly assigned to me in accordance with the practice of the Court. It was argued March 9, 1972. April 3 I submitted to the Justices a proposed opinion headed "PER CURIAM" which, to the paragraph commencing "[a] separate question is raised and briefed" *(ante 442)*, remains intact.

That opinion as proposed was amended by the writer August 9, so as to include treatment of the second question above. My August 9 memo to the Justices advised and concluded:

"The reason for treatment of the second question was my discovery of the uncited case of *Lake Superior Iron Co v Erickson,* 39 Mich 492 [1878]. I called Justice BRENNAN's attention to this case prior to the time he prepared and turned in his opinion, and he has dealt with it according to his views. In addition to this information the Chief Justice says he expects to propose for consideration at our next conference some additional material he deems pertinent both to the *Mc-*

*Donough Case* and the yet unsubmitted *Funk v General Motors Case.*

"The foregoing, I believe, will get the case back on schedule so that it may move along."

Now that the day of around-the-table judgment has arrived, it appears that the submitted Per Curiam opinion will make no precedent; hence this explanation to the profession.

T. M. KAVANAGH, C. J. *(concur in part, dissent in part).* Although I fully agree with the Per Curiam construction and application of the doctrine of "inherently dangerous activity," I am unwilling to foreclose, by exclusive and restrictive reliance upon this doctrine, the applicability to this or future cases of other rules of tort law which affix liability upon the landowner who, for economic benefit or otherwise, engages an independent contractor and then negligently injures an employee of the independent contractor. To base liability of negligent landowners upon a single doctrine ignores the innumerable factual circumstances giving rise to the cause of action and varying relationships of the parties.

The doctrine of "inherently dangerous activity," as relevant to the type of action brought against a landowner by an injured employee of an independent contractor,[1] has, of course, been recognized in Michigan jurisprudence for nearly 100 years. As concluded by Chief Justice CAMPBELL in *Lake Superior Iron Co v Erickson,* 39 Mich 492, 502–503 (1878):

"Under such circumstances it is very plain that the company being the owners of the dangerous property,

---

[1] Precise analysis necessitates recognition of the fact that the concept of an inherently dangerous activity or object will take on different shades of meanings in differing contexts.

and inviting men to work on it, their responsibility for its protection cannot be changed by the fact that the work is done by the ton instead of by the day, or by the fact that the men who contract with them have laborers of their own. By employing men to act for them in either way they hold out the assurance that they can work in the mine on the ordinary conditions of safety usually found in such places. They guarantee nothing more than is usual among prudent owners, and they do not insure against that which is purely accidental. But they do tacitly represent that they have not been and will not be reckless themselves."

The fact that *Erickson* arose before the advent of the workmen's compensation laws, as noted by Justice T. E. BRENNAN's opinion, is of no consequence.[2] The law and logic of *Erickson* has, if anything, gained force and recognition with the passage of time and irrespective of enactment of remedial and protective legislation. In *Clark v Dalman,* 379 Mich 251 (1967), we reiterated that the general duty of a contractor who under the facts of that case was constructively in possession and control of the property, "to act so as not to unreasonably endanger the well-being of employees of either subcontractors or inspectors, or anyone else lawfully on the site of the project, is well settled." *Cf.* also 2 Harper and James, Torts, § 27.12, p 1481.

There is little room for argument with that part of Justice T. E. BRENNAN's statement that "[t]he rule [of inherent dangerous activity] is not designed, nor was it ever intended to benefit the contractor * * * ." But, it violates logic and established law to conclude that the independent con-

---

[2] The workmen's compensation law has never abrogated an injured employee's common-law right to bring an action against a third-party wrongdoer. See *Albert A. Albrecht Co v Whitehead & Kales Iron Works,* 200 Mich 109 (1918); *Smith v Port Huron Gas & Electric Co,* 217 Mich 519, 522 (1922).

tractor's employee—who after all derives no personal economic benefit, other than that of any ordinary employee, from the contractual relationship between the landowner and his employer—is relegated to a class outside the protection of negligence law or that the rule of liability is so restrictive as to only "protect innocent third parties". To capsulize *Clark v Dalman, supra,* the rule protects *everyone* lawfully on the site of the project. Thus, where evidence is adduced demonstrating that work to be done involves "special danger" or is "inherently dangerous," the rule advanced in the Per Curiam opinion and its supporting authorities, *e.g.,* 2 Restatement Torts, 2d, § 427, is fully applicable.

On the other hand, I find as quite cogent the reasoning of Justice T. E. Brennan's opinion, relating to reliance upon the independent contractor's and likewise his employees' expertise to perform the job and/or repairs for which they were hired. It is fair to assume that the landowner retains the independent contractor because of the latter's expertise to perform the task properly and carefully. Absent special factors, such as supervening control by the landowner, the method and means of executing the task are entrusted to the independent contractor and his employees. Thus, there is little basis for shifting liability upon the landowner where for example, and modifying Justice T. E. Brennan's analogy slightly, the landowner engaged the independent contractor to remove a tree stump and the latter's employee, while using a chain saw—certainly a dangerous instrumentality in the hands of the inexperienced —injures himself or another lawfully on the premises. Whether the contractor uses a double-edged ax or cross-cut saw or chain saw, one can presume,

leaving aside the factors of landowner's control and direction, that the contractor not only has the familiarity and experience with his tools, but also will use them in such fashion as to avoid injury to himself or others.

The inherently dangerous activity doctrine, however, does not encompass the factual situations presented by the majority of the cases. More typically, the employee of an independent contractor is injured by some cause not arising out of or related to the contractual relationship. This brings to bear the general rule stated in 31 ALR2d 1375 at 1381–1384:

"There is a line of cases supporting the proposition that, as an exception to the general rule requiring the owner or occupier of premises (contractee) to furnish a safe place of work to an independent contractor and the latter's employees, the owner or occupier is under no duty to protect them against risks arising from or intimately connected with defects of the premises, or of machinery or appliances located thereon, which the contractor was undertaken to repair.

"Closely related to the exception stated above is the rule that the owner is not liable for death or injury of an independent contractor or one of his employees resulting from dangers which the contractor, as an expert, has known, or as to which he and his employees 'assumed the risk.'

"In support of the exception to the 'safe place' doctrine, it has been pointed out that, before repairs of any kind can be made to a structure or thing, it is first necessary to find out what is wrong with it, that it is the responsibility of the repairman to determine what that defect is, that the contractor, under his contract to repair, has the duty of discovering any latent defect, and if he fails to do so he fails not only to fulfil *[sic]* his contract but also to perform his duty to his employee, and that the contractor has an equal or even a better opportunity to discover any defects than has the contractee. * * *

"On the other hand, where a risk separate and distinct from those created by the defects to be repaired under the contract resulted in the injury or death of a contractor or an employee of the latter, it has been held that a contractee cannot successfully invoke the defense of assumption of risk, and that the general rules (which are not the same in all jurisdictions) governing the extent of his duty to furnish an independent contractor and his employees a safe place of work and to warn them of hidden dangers are applicable."

Under this rule, and continuing Justice T. E. Brennan's analogy, if the independent contractor is hired to remove a stump but in the process is electrocuted by a high voltage line negligently left lying on the ground by the landowner, then the landowner cannot escape liability simply because he turned the premises and job over to the contractor. Of course, the determination of whether the risk is in fact separate and distinct from those created by the defects to be repaired must be resolved by the jury.

Under the facts of the instant case, sufficient proofs and reasonable inferences therefrom were presented and give rise, at least, to a jury submissible question of whether the work to be performed by plaintiff's decedent's employer is an inherently dangerous activity, and whether that degree of care was used which an ordinarily prudent person would use under the same or similar circumstances. I agree that the judgment and opinions below must be reversed and the cause remanded for new trial.

Adams, J., concurred with T. M. Kavanagh, C. J.

Williams, J. *(concurring).* I concur with the Per Curiam and the Chief Justice's opinions that the

inherently-dangerous-non-delegable-duty rule may be applicable to this case. I concur also with the Chief Justice's opinion that in addition thereto other legal theories may likewise be applicable.

T. E. BRENNAN, J. *(dissenting).* I dissent.

The general rule of law is that an owner of premises is not liable to persons injured through the negligence of an independent contractor.

There is a well developed exception to that rule, in cases where the contract calls for the performance on an inherently dangerous activity.

In such cases, it is said that a nondelegable duty reposes with the owner; that he may not insulate himself from the performance of that duty by the employment of a contractor.

The application of this well settled exception is clear in cases where the injured person is a stranger to the inherently dangerous activity. In *Inglis v Millersburg Driving Association,* 169 Mich 311 (1912), the inherently dangerous activity was burning, and the plaintiff was a neighboring landowner; in *Grinnell v Carbide & Carbon Chemicals Corp,* 282 Mich 509 (1937), the danger was explosion, the plaintiff a purchaser of a stove; in *Watkins v Gabriel Steel Co,* 260 Mich 692 (1932), the dangerous activity was elevated steel construction, the plaintiff a mason contractor; in *Olah v Katz,* 234 Mich 112 (1926), the danger was an open pit, the plaintiff a neighboring child; in *Detroit v Corey,* 9 Mich 165 (1861), the danger was an open ditch, the plaintiff a passer-by; in *Darmstaetter v Moynahan,* 27 Mich 188 (1873), the danger was a wall of ice in the roadway, the plaintiff a sleigh rider; in *McWilliams v Detroit Central Mills Co,* 31 Mich 274 (1875), the danger was a railroad switching operation, the plaintiff a passer-by. The

leading case from our sister state of Ohio, *Covington & Cincinnati Bridge Co v Steinbrock & Patrick,* 61 Ohio 215; 55 NE 618 (1899), was an instance of unsupported walls which fell upon and injured a neighbor. The English cases discussed in *Covington* are mostly based upon the theory of lateral support and involve injury or damage to neighbors.

Indeed, there are almost no cases which have come to notice in which the suit is brought by or on behalf of a plaintiff who was himself actively engaged in the inherently dangerous activity.

Those few precedents which are cited seem to be founded upon other grounds. Thus *Lake Superior Iron Co v Erickson,* 39 Mich 492 (1878), was a suit by a workman engaged in mining. The danger there was a falling rock, not shored up by the mine owners. Liability was predicated upon the *condition of the premises,* and the undelegated as opposed to nondelegable duty of the mine owners to guard against falling rocks.

"They testified, and the jury must have believed them, that the company reserved the power of determining when and where dangerous rock in the wall should be removed, if requiring removal by blasting, and of locating the supporting pillars or placing timbers to prop the wall. Such timbering would be expensive, and is not provided for by the contracts which are confined to rock and ore blasting and removal. Either the mine must be unguarded, or else, on this state of facts, the company must guard it.

"Under such circumstances it is very plain that the company being the owners of the dangerous property, and inviting men to work on it, their responsibility for its protection cannot be changed by the fact that the work is done by the ton instead of by the day, or by the fact that the men who contract with them have laborers of their own. By employing men to act for them in either way they hold out the assurance that they can

work in the mine on the ordinary conditions of safety usually found in such places. They guarantee nothing more than is usual among prudent owners, and they do not insure against that which is purely accidental. But they do tacitly represent that they have not been and will not be reckless themselves." *Lake Superior Iron Co v Erickson, supra,* 502–503.

*Lake Superior Iron Co v Erickson* arose before the advent of the workmen's compensation laws. It was then competent for the workman to bring suit against his employer. The points of law cited by both litigants in their briefs to the Court demonstrate that the case was essentially such an action.

*Utley v Taylor & Gaskin, Inc,* 305 Mich 561 (1943), was a similar case to *Watkins v Gabriel Steel Co, supra,* with one added twist. In *Watkins,* the mason contractor was injured through the negligence of the structural steel subcontractor and the mason was permitted to recover from the general steel contractor on the principle of the *Inglis, Olah* and *Wight* cases.

In *Utley,* the injured mason was an employee of the general contractor. At that time, 1937, the workmen's compensation law gave the employee the option of claiming compensation benefits or maintaining a tort action against a responsible third party. Moore, the mason, chose workmen's compensation, and the plaintiff Utley was the general contractor who as Moore's subrogee brought suit against the negligent structural steel subcontractor. In *Utley,* it was the defendant who relied on *Olah, Wight* and *Watkins.*

"In other words, defendant claims that, steel construction work being inherently or intrinsically dangerous, the exception to the independent contractor rule is applicable; that under such rule plaintiff is liable for the negligence of defendant as an independent contrac-

tor; and that such negligence, imputed to plaintiff, bars his recovery." *Utley v Taylor & Gaskin, Inc, supra,* 571.

There, it was held that *plaintiff Utley* as statutory subrogee, stood in the shoes of the injured workman. Plaintiff's own negligence was not imputed to the workman, and was held not to bar recovery.

An excellent statement of the rationale of the "inherently dangerous activity" doctrine is found in *Covington,* cited above:

"It is urged as unreasonable that one who has work to perform, that he himself cannot perform, from want of knowledge or skill, should be held liable for the negligence of one whom he employed to do it, since, if he did reserve control, it would avail nothing from his own want of knowledge and skill. There is a seeming force in this, but only so. It is not agreeable to the principles of distributive justice. For it is equally a hardship that one should suffer loss by the negligent performance of work which another procured to be done for his own benefit, and which he in no way promoted and over which he had no control. Hence, where work is to be done that may endanger others, there is no real hardship in holding the party, for whom it is done, responsible for neglect in doing it. Though he may not be able to do it himself, or intelligently supervise it, he will nevertheless, be the more careful in selecting an agent to act for him. This is a duty which arises in all cases where an agent is employed; and no harm can come from stimulating its exercise in the employment of an independent contractor, where the rights of others are concerned." p 229.

The foregoing quotation, and the statement from Cooley on Torts, quoted in my Brother's opinion, emphasize that the rule of liability is designed to protect innocent third parties injured by the execution of an inherently dangerous undertaking. The rule is not designed, nor was it ever intended

to benefit the contractor who undertakes the dangerous work, or his employees.

Thus, if I employ a contractor to remove a tree stump from my yard by use of explosives, I am liable to my neighbor whose garage is damaged by the concussion. This is because it is I who have set the project in motion; it is I who have created the unusual peril; it is for my benefit that the explosives were used. As between myself and my neighbor, I ought not to be permitted to plead that it was the contractor's negligence and not my own which damaged his property.

But if the contractor should blow up his own truck, I should not be liable. He is the expert in explosives and not me. I had neither the legal right nor the capability to supervise his work. The same would be true if the contractor's workman had injured himself, or been injured by the carelessness of a fellow workman or the negligence of his employer. Neither the contractor nor his employees are "others", as contemplated in Cooley's statement of the rule. Indeed, they are privy to the contract which creates the peril.

The mischief of today's decision is not its result, but its logic. One assumes that a company like General Motors has no want of access to expertise. It may well have safety engineers on its payroll far more knowledgeable about structural steel than the decedent's employer. But to predicate liability here on the *Inglis, Olah, Wight* and *Watkins* line of cases is to impose upon many, many other, less sophisticated defendants the same burden to attend to the safety of the employees of independent contractors.

T. G. Kavanagh, J., concurred with T. E. Brennan, J.