THE FORNCROOK MANUFACTURING COMPANY v. THE E. T. BARNUM WIRE AND IRON WORKS.

|See 54 Mich. 552.]

*Assignment for benefit of creditors—Patent—Infringement of—* *Judgment.*

Plaintiff was engaged in the manufacture and sale of cheese-safes under *certain* patents, and transferred to defendant, a corporation engaged in the manufacture and sale of *other kinds* of cheese-safes, the *exclusive* right for five years in its patents, on condition that defendant should use all *reasonable* diligence in the manufacture of safes, embracing the *novel* features of plaintiff's patents, as the *demands* of the markets might require in the United States, and fill *all* orders *received* for the same, which it was to advertise in its annual circular, and pay plaintiff a royalty of fifteen cents for each safe with glass sides, having *either* or *both* of plaintiff's improvements.   Defendant reserved the right to sell any *other* cheese-safes having either or both of

said improvements, by paying a like royalty, and all royalties to cease if the patents were declared void; and plaintiff was bound, at its own expense, to suppress infringements. Plaintiff was to turn over to defendant all orders received, and defendant was not bound to sell the safes or supply the market for *less* than a *fixed* price per safe.

By a second contract defendant agreed, as soon as may be, to sell all the safes plaintiff had on hand, *finished* and *unfinished*, at not less than the circular schedule prices, for an agreed commission; and at the same time the inventor of the patents, who was president of the plaintiff corporation, entered into defendant's employment for five years, as a traveling salesman, at a fixed salary, with an agreed commission for each safe sold. Plaintiff turned over a large number of safes for sale, which defendant advertised the same as the others, and sold whenever a purchaser applied for or wanted one; but the sales were *slow*, and finally plaintiff took the remaining safes, and sold them at a low price.

Defendant made a general assignment for the benefit of creditors, and plaintiff filed a claim under *each* agreement, under the statute, and was awarded damages based, in part, on the *full* value of the safes turned over to defendant for sale, on the ground that the sales were lost through defendant's fault in not *pushing* such sales. Written findings of fact were made by the court, which are claimed not to be supported by the testimony in important particulars. On this state of facts the Court *held:*

1. The proceeding under How. Stat. §§ 8742-5-6-7, to establish a claim against an assignor, is put by the statute on the footing of a common-law suit, and is the same as if so prosecuted in the absence of any assignment; and on review the Supreme Court is not authorized to find or determine facts.

2. The contracts were simultaneous in date, and should be treated as bearing more or less on each other; and, so far as the safes *on hand* are concerned, it was merely an ordinary case of sales on a fixed commission, and it would be unreasonable to hold defendant bound to put *these* safes on any other footing than other articles kept on sale, or to force them on the market at the expense of other interests. There was no obligation to give them a preference, or to use more than *usual* diligence to dispose of them. If the trade was informed of them, and of their price, in the *usual* manner, defendant fulfilled its duty by selling them when applied for.

3. A contract for the *use* by a manufacturer of a patent provided that, in case it should be declared invalid by the court, the payment of royalty should cease, and, in case any other party should commence the manufacture and sale of the patented article, it should be the duty of the licensor to prevent such infringement

without expense to the licensee, and to use due diligence in so doing.

*Held*, that this clause of the contract required *reasonably* prompt action on the part of the licensor, and implied that the licensee should not suffer from infringements not *thus* prevented.

*Held*, further, that the circuit courts of the United States, subject to appeals to the United States Supreme Court, are the *only* ones which have *direct* jurisdiction to punish or prevent infringements of patents, and that the clause referred to the decision of *one* of these courts.

*Held*, further, that while the question of plaintiff's default in not preventing such infringements is open on this record, yet defendant, by its contract, is subject to the royalties as if the patents were *valid* for what they *distinctly claim*, the *extent* and *bearing* of which claim is open to construction; and that the question of *what* the invention purports to cover is the *main* controversy, and must be passed upon in this suit.

4. All patents for devices and improvements in the construction of articles of utility must be construed in the light of what was in use before, most of which is assumed to be matter of *general,* and therefore of *judicial,* knowledge.

5. For a full consideration of the patents involved in this suit see pages 203–208 of opinion.

Case made from Wayne. (Jennison, J.) Argued July 15 and 16, 1886. Decided October 14, 1886.

Claim filed under assignment law. Defendant brings error. Reversed. The facts are stated in the opinion.

*Hoyt Post,* for appellant.

[No authorities cited.—REPORTER.]

*Fraser & Gates,* for claimant:

It is of no consequence that immaterial facts were improperly found; the judgment must stand: *Tower v. Detroit, L. & L. M. R. R. Co.,* 34 Mich. 328, 337–8; *Gillam v. Boynton,* 36 Id. 236.

Letters patent are *prima facie* evidence of utility and novelty: Curtis' Patents, §§ 30,358: *Lehnbeuter v. Holthaus,* 105 U. S. 94.

The agreement to use due diligence to prevent infringe-

ments is an independent covenent, and its violation no defense: 2 Parsons, Contracts (6th ed.), 674–5.

Defendant is estopped from questioning the validity of claimant's patents: *Hall Mfg. Co. v. Am. Ry. Supply Co.*, 48 Mich. 331; *Forncrook Mfg. Co. v. E. T. Barnum Wire & Iron Works*, 54 Id. 552.

Defendant is liable in damages for refusing to sell plaintiff's safes: *Evans v. Root*, 7 N. Y. 186; *Bell v. Palmer*, 6 Cowen, 128: *Bell v. Cunningham*, 3 Peters, 69; *Sisson v. Cleveland & T. R. R. Co.*, 14 Mich. 489, 500; *Platt v. Brand*, 26 Id. 173.

CAMPBELL, C. J.   Defendant made a general assignment, and the present proceeding was had to establish a claim under the statute.[1]   During the active business of defendant, it was, among other things, engaged in making and selling different kinds of cheese-safes, and previous to December, 1882, had made them, to some extent, under patents issued to one Gordon.   The plaintiff company had been organized to make and sell cheese-safes according to certain patents issued to Isaac S. Forncrook, the chief stockholder and president.

On the twenty-third day of December, 1882, plaintiff and defendant entered into an agreement, which was, in substance, this:   Plaintiff was to transfer to defendant an exclusive right for five years in the Forncrook patents.   In consideration thereof defendant agreed to use all reasonable diligence in the manufacture of such glass cheese-safes, embracing the novel features of the patents, as the demands of the markets may require in the United States, and fill all orders for glass safes, including either or both of such patent improvements, and to advertise the same in the annual circular of defendant, and to pay fifteen cents for each safe with glass sides, having either or both of said improvements, as a royalty.   Statements and payments were to be rendered every six months.   Defendant had the right to make and sell any other cheese-safes having either or both said improvements, by paying fifteen cents royalty on each sale.

[1]How. Stat. §§ 8742-5-6-7.

Royalties were to cease if the patents were declared void. Plaintiff was bound, at its own expense, to suppress infringements.    Plaintiff was to turn out all orders to defendant, which was not bound to sell the safes or supply the market below $3.25 for each safe.

By a second agreement defendant agreed, as soon as may be; to sell all the cheese-safes which plaintiff had on hand, finished and unfinished, at not less than the circular schedule prices,—No. 1, $75 a dozen; No. 2, glass, $40 a dozen; No. 2, wire, $36 a dozen; No. 4, glass, $24 per dozen,—less 15 per cent., and 2 per cent. for cash.

At the same time Mr. Forncrook entered into defendant's employment for five years, as a traveling salesman, for $1,200 a year and expenses, and three cents for each safe sold having his improvements, and for each square cheese-safe known as Gordon's patent.    Deductions of commissions were to be made in case the patents were invalid, or sales made of necessity at less than regular prices.

The present claim is based on both of the agreements between plaintiff and defendant.    Damages are sought and were given because of a failure to sell the safes turned over to defendant.    Royalties were asked and given for sales of several thousand safes, alleged to have contained part or all of the Forncrook improvements.

The court below, trying the issues without a jury, made several findings of fact, which it is claimed are not, in important particulars, supported by evidence.    Objection is also made to rulings upon testimony, and to the construction of the contracts and of the patents.

As the proceeding is put by the statute on the footing of a common law-suit, and is the same as if so prosecuted in the absence of any assignment, we are not authorized to find facts ourselves or to determine them; but some matters considered below as questions of fact are claimed to be substantially questions of construction and of law.

The two contracts were treated separately on the argument, and may be so treated here.

Damages were given based on the full value of the safes turned over to defendant for sale, on the ground that the sales were lost by defendant's fault, and this fault is laid to failure to push the sales. It appears that prior to June, 1883, but a small part of these safes had been sold, and they were then taken by plaintiff, and sold at a low price. Defendant claimed to have used proper diligence, but that, by reason of the price, and also of the want of demand for safes of those patterns, they were not disposed of because of no purchasers seeking them.

From the rulings made upon the reception of certain testimony, especially of Mr. Forncrook, it is evident the findings were based partly, if not altogether, upon the idea that defendant was bound to use peculiar diligence in selling these safes, and in withholding others from competition. It appears that they were advertised in the same way as the others, and that they were sold whenever a purchaser applied for or wanted one.

We do not think these rulings consistent with the contracts. Defendant was largely engaged in making and selling safes of different patterns. These contracts were simultaneous in date, and should be treated as bearing more or less on each other, although, in the particulars now referred to, the effect of reading them singly would not be different. It may fairly be deduced from these transactions that defendant expected, by getting control of plaintiff's patents, to get rid of some rivalry, as well as to enlarge its variety of goods. So far as the safes on hand are concerned, it was merely an ordinary case of sales on commission, for a compensation of 15 per cent., which would amount, in all, to between $200 and $250 on the 743 safes. Mr. Forncrook was employed as traveling salesman at $1,200 a year and expenses, and other agents were also sent out. The annual sales of

all kinds are claimed to have reached 12,000 to 15,000, and the defendant was not required by either contract to abstain from making and selling any kind it chose to put in the market.

It would be grossly unreasonable to hold defendant bound to put these safes on any other footing than other articles kept on sale, or to force them on the market at the expense of other interests. There was no obligation to give them a preference, or to use more than usual diligence to dispose of them. If the trade was informed of them, and of their price, in the usual manner, then defendant fulfilled its duty by selling them when applied for. If other safes were regarded by dealers and purchasers as cheaper or better, defendant was justified in selling what was demanded. In all such matters, facts are more reliable than opinions, and if articles were given a fair chance, and are not sold, defendant cannot be held responsible for not using extra efforts to sell them. Testimony was received, under objection, which would only have been admissible on that ground, and it is evident the findings could not have been made as they were on any other. It was the right of defendant to have findings which would show their basis specifically. Enough appears to show that the theory complained of determined a large share, if not all, of the damages for not selling the safes.

The other questions arise under the claim that defendant has made safes including some of the Forncrook inventions, and is responsible for the stipulated royalties. Some discussion was had upon the question whether defendant could dispute the validity of plaintiff's claims as an inventor, and use the devices without royalty, if not original.

The contract containing the transfer or license to defendant has this provision:

"In case either or both of such patents shall be declared invalid by the court, this agreement shall be thereby so mod-

ified as to release the payment of said royalty by said second party, and, in case any other party or parties shall commence the manufacture and sale of cheese-safes embracing such improvements, it shall be the duty of said first party to prevent such infringement without expense to said second party, and use due diligence to suppress such infringement."

This clause requires reasonably prompt action on the part of plaintiff to prevent infringements by others, and implies that defendant shall not suffer from infringements not prevented. But the only courts which have direct jurisdiction to punish or prevent infringements of patents are the circuit courts of the United States, subject to appeals to the Supreme Court of the United States. We think the clause, taken together, refers to the decision of one of those courts as the condition of a release of royalty. The question of invention, like any other question, may come up for some purposes in any other court; but the contract refers to some holding bearing directly on the patent, and authoritative. While, therefore, the question whether plaintiff is in default for not preventing others from infringing the patents is open on this record, yet we think defendant is, by its contract, subject to the royalties as if the patents were valid for what they distinctly claim. But we have no doubt that the extent and bearing of those claims is properly open to construction, and that the question of what the invention purported to cover is the main controversy, and must be passed upon in this suit. There is no question of infringement, because defendant has full license to use the inventions. The question is how far they have been used.

All patents for devices and improvements in the construction of articles of utility must be construed in the light of what was in use before, most of which is assumed to be matter of general, and therefore of judicial, knowledge. All of the patents which are set out in this record take for granted the familiar and known use of such articles as are described as cheese-safes, for the main purpose of preserving cheese

and similar provisions in good order, and capable of more extended use for larger classes of substances requiring similar protection. The principal invention claimed by plaintiff is stated as intended to apply to cheese-safes, "such as are used by retailers, where frequent access to the interior is required, and which, when closed, will exclude flies and other vermin from its contents. The invention consists in the peculiar construction and arrangement of parts, by means of which hinged doors are avoided, as more fully hereinafter described." As the principal claim arises out of the alleged use of this patented invention, it is necessary to refer to it with some care. There is a later patent, covering a cheese-board, and certain methods of setting the glass sides of safes, to be referred to further on.

Patent No. 212,207, dated February 11, 1879, for an "improvement in cheese-safes," for the general purpose already quoted, describes, in words and with drawings, a cheese-safe of square form, with top and bottom of wood, and sides and back of glass or other suitable material, with a pivoted turntable to hold cheese. Thus far it is not claimed there is anything new. It then proceeds to describe the construction of the front, so as to leave on either side an interior channel, in which a flexible wire door or curtain is to slide up and down, the sides occupying the channels being backed and faced with leather or other proper material, so as to fit snugly in the channels. A similar channel is continued across the interior of the top of the safe, to enable the same door or curtain to pass horizontally as raised up. The bottom of this curtain is fixed on a wooden bar, with a proper knob or handle, to enable it to be raised or pulled down easily. In order to turn the curtain backward across the top of the safe when raised, a triangular wooden bar is also attached to the upper end of the curtain, which is made, by means of certain flexible inclines on the inside, to push against inclines in the top of the front, and is thereby

turned into the channel across the top of the safe, over a roller opposite the fixed inclines. After describing the mechanism, the claim is described in this wise:

"What I claim as my invention, and desire to secure by letters patent, is:

"1. A cheese-safe, constructed substantially as herein described, provided with a curtain through which air may circulate, adapted to slide upward and rearward, substantially as and for the purposes set forth.

"2. In a cheese-safe, and in combination with vertical and horizontal channels as described, and with a curtain of wire cloth, the inclines hereinbefore described, for the purpose of changing the direction of the curtain from a vertical to a horizontal position, substantially as specified."

It seems to us there is no great difficulty in ascertaining the meaning of this invention. It is meant to substitute, for wire-cloth doors working on hinges and swinging out, the same open wire-work door, so arranged as to be moved up and down entirely within the safe, with such flexible sides as to keep within a channel, which changes direction at the top of the safe, by means of devices which turn its course, by the aid of inclines, from a vertical to a horizontal direction. The use of the inclines as described is expressly confined to such a movable wire-cloth curtain; and from the specifications it may be inferred that the inventor regarded as a *desideratum* a contrivance which would make it practicable to use that material, which opposed no obstacle to a free circulation of air, as a curtain moving entirely within the safe, and taking up very little room.

This is illustrated very well by the testimony, which shows that, while more rigid materials have been readily used for similar curtains, wire cloth is not so easily managed, and is liable to break or bind; and the elasticity of the arrangements devised by Mr. Forncrook, for turning the course of the curtain, was evidently intended to facilitate the change of direction.

The infringement—or, to speak more correctly, the use—

of this patent is claimed to be made out by the use of doors or curtains of slats, fastened to a cloth backing, and occupying an analogous position and purpose to the wire-cloth curtain patented; and this asserted identity is set up both against the slat door generally, and as more or less modified. Another use is asserted to be in the manufacture of semi-cylindrical wire-cloth safes, where the front part is a door whose ends are the arc of a circle, and, on being raised, revolve within the rear portion of the cylinder.

It is not suggested in plaintiff's patent that a claim is made for every kind of flexible door or curtain that works inside of the article which it closes, whether a cheese-safe or anything else. Such devices have been very common and familiar, and the language of the specifications bears no such construction. Assuming, as under the contract in question we must assume, that the patent is good for what it purports to cover, it cannot be enlarged. It covers nothing but a door which is all open work, except as stiffened by the end bars, by aid of which it is raised and lowered. It is questionable whether the inventor did not understand that it applied only to safes which were close shut except for the door. But we are inclined to think it broad enough to cover any wire door which is made to work on the same principle. That principle seems to be bordering the wire with some flexible but firm bordering of leather or similar material, and turning it from the upright to the horizontal channel by an elastic arrangement, whereby it is deflected without being confined at the turn in a groove.

A slat door with cloth backing, where the slats are contiguous, is in no sense analogous to an open-work door. The passage of air in such quantities as would work through cloth, or around the ends of the slats, would not create the same sort of ventilation as would be created by one of wire cloth, especially where the case was otherwise solidly closed. And where the sides themselves are of wire cloth, neither

would be of any use for ventilation, and the only advantage would be what would be derived from a door which works entirely within the frame of the safe, and out of the way. No one pretends this to be patented. It is straining things a good deal to find mechanical invention in any of these devices, except in the form and combination of the door and its gearing. It is very well settled that, usually, a new use of an old device is not patentable at all, and, in construing such a patent, it can only be enforced as to what is new in the method.

In the present case, when defendant took the transfer from plaintiff, it was already possessed of the right to use upon glass-sided or other close-sided safes a slat door, working upward or downward in substantially the same way as plaintiff's wire door, and sliding in grooves into either top or bottom of the safe. It must be presumed that this patent, issued by the proper office, does not interfere with any prior monopoly, and is valid for its claims, as against all others. No doubt a second patent may be invalid as against a former one, wholly or partly, but it is, at any rate, evidence that the patent office did not so regard it. We think that, whether valid or not, neither is substantially identical with the other. Whether partly perforated or not, the slat door cannot be the same as the wire door, and auxiliary ventilation in any other part of the safe, whether by whole wire sides or back, or by smaller openings, would make no difference.

A more serious question arises, whether the device used by plaintiff for turning the curtain to a horizontal position is a separate claim, applicable to all such doors. It must not be lost sight of that the questions involved do not require the determination of the nature or validity of the other patents owned by defendant, known as the Gordon patents. The question is whether it has used plaintiff's devices.

The claim for the use of the inclines, as set out in the

Forncrook patent, is confined expressly to their use with a wire-cloth curtain.  If too narrow, it can only be enlarged by proper amendment or reissue of the patent.  But the testimony indicates that there are difficulties in handling wire cloth which do not exist in regard to slats, which are more rigid, and firmer, and easier to keep in place.  We have found no very clear proof that defendant has used for its slat doors any means of deflection not substantially similar to the devices always used for turning the direction of the curtain.  But we think the use is not within the contract, as a ground of royalty, with the slat curtains.

So far as the semi-cylindrical safes are concerned, we do not think the Gordon pattern in any way infringes the Forncrook patent.  Revolving the cover by fastening the ends of the wire cloth upon solid or stiff segments, revolving on an axis, is a distinct method from one which moves the cover in grooves on fixed ends.  As already stated, the Forncrook patent is confined to a flexible wire curtain that accommodates itself, by means of certain devices, to the change of direction from upward to horizontal.  Where the door slides in grooves without change of direction, it is evident that there can be no advantage in flexible edges, but rather a disadvantage ; and that method of cover is one of the oldest and commonest devices, familiar to every one.  Making a stiff cylindrical door, of any material whatever, does not come within the Forncrook patent.

A claim was made and allowed for the use of the patent for a cheese-board which not only revolves, but draws out without disturbing the center-pin.  No one claims novelty in a revolving board, which appears in all the safes in this controversy.  But one of Mr. Forncrook's patents describes a method by which this revolving board may be drawn out to the front and slid back again without removing it, this being done by means of a groove and bar, operating in some respects like a turn-table, when brought into the requisite posi-

tion. The patent claim does not confine this to any particular construction, and it is evident that this idea can be carried out in several equivalent ways. There seems to have been testimony that some arrangement involving this device was more or less used, and, so far as used, it was protected by the contract.

No question seems to be raised applicable to the method devised for setting and removing glass by means of certain devices in the corner posts of the safes.

From what has been said, it follows that there are errors which require a reversal. We do not discuss the weight of evidence, upon which some time was spent on the trial. But it appears to us there is a lack of testimony on any theory to sustain the findings concerning the number of the different kinds of safes disposed of or made. To a certain extent, circumstantial evidence is admissible to prove what cannot be proved otherwise. But circumstantial testimony must consist of facts, and not of conjectures or hearsay, and of this there is a good deal in the record, which should have been shut out and disregarded. We think, also, that the findings are not definite upon some of the elements of the controversy.

As this record does not include any claim for damages for not endeavoring to market safes made after the Forncrook patents (except such as were turned over ready made), no reference need be made to that.

The judgment should be reversed, and a new trial ordered.

The other Justices concurred.